**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)**

| | |
|---|---|
| **CAROLYN KINSEY**<br>204 Riverway Court, Apt. 3<br>Owings Mills, MD 21117<br>*Resident of Baltimore County*<br><br>Plaintiff,<br><br>*Individually and on Behalf of All<br>Similarly Situated Employees*<br><br>v.<br><br>**EVERGREEN HEALTH<br>COOPERATIVE, INC.**<br>3000 Falls Road, Suite 1<br>Baltimore, MD 21211<br><br>Serve: Mary Porter<br>　　　3000 Falls Road, Suite 1<br>　　　Baltimore, MD 21211<br><br>　　　　Defendant. | Collective Action Claim<br><br><br><br>Jury Trial Requested<br><br><br><br>Civil Action No.: |

## COLLECTIVE ACTION COMPLAINT FOR WAGES OWED

CAROLYN KINSEY, Plaintiff, by and through her undersigned counsel and The Law

Offices of Peter T. Nicholl, on behalf of herself and all others similarly situated, hereby submits

her Complaint against EVERGREEN HEALTH COOPERATIVE, INC., Defendant, to recover

unpaid wages, liquidated damages, interest, reasonable attorneys' fees and costs under Section

16(b) of the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq.*

(hereinafter, "FLSA"); unpaid wages, liquidated damages, interest, reasonable attorneys' fees and

costs under Maryland Wage and Hour Law, Md. Code Ann., Lab. & Empl. §§ 3-401, *et seq.*

(hereinafter, "MWHL"); and unpaid wages, treble damages, interest, reasonable attorneys' fees

and costs under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§ 3-501, *et seq*. (hereinafter, "MWPCL"), and in support thereof, states as follows:

## INTRODUCTION AND BACKGROUND

Defendant is a healthcare insurance cooperative. Defendant provides insurance plans to individual subscribers and corporate groups. Defendant features a national network of over seven hundred thousand (700,000) healthcare providers. Defendant employs a team of staff members for purposes of carrying out its business needs. There are approximately seventy-five (75) employees in total.

Defendant hired Plaintiff to perform work as an account manager. This role consisted primarily of tasks regarding the renewal of individual and group insurance plans. In this capacity, Plaintiff served as a liaison and would discuss various plan options with third-party members. These members included insurance brokers and employer groups. There were many different options that a member could choose from. Defendant was keen on offering a wide portfolio.

The benefits and premiums of each plan were pre-determined by Defendant. It was routine for these components to change. Plaintiff was required to inform members of these changes. This was typically accomplished through regular presentations.

Plaintiff performed a great deal of clerical work as well. This work was attributable to her renewal tasks. Anytime members or member groups requested changes to their plan, Plaintiff would have to procure the new information. This was for purposes of calculating the new monthly premiums and renewal rates for the particular subscriber. The renewal rates were calculated automatically by means of software. This was specific to a formula that had already been logged into Defendant's system.

Once the new renewal rates were generated, Plaintiff was responsible for communicating this information to the subscriber. The information had to be released to third party administrators, brokers and employer groups. There were specific protocols in regard to the timing of this process. It was demanded that Plaintiff follow these procedures precisely.

Plaintiff's duties also involved a significant amount of data entry. This too was specific to the renewal process. If there was a benefit change requested by a particular group, Plaintiff had to enter the requested change into Defendant's system. This was to ensure that a subscriber's files were appropriately updated. It was Plaintiff's responsibility to make sure that all changes to the benefit plans were correctly entered into the system. There were strict guidelines specific to this task.

Plaintiff's heavy workload increased over time. This resulted from Defendant transitioning from one member-services vendor to another. The transition caused Plaintiff's workload to increase significantly. The change primarily resulted from understaffing.

The lack of competency of other employees also caused Plaintiff's workload to shift. This was specific to the poor training the employees received. These employees were mostly staffed in the member-services department.

Plaintiff's primary duties were those specific to the account manager position. However understaffing and poor training required that Plaintiff take on additional duties. Most of these duties were clerical in nature. They primarily involved having to address multiple inquiries regarding a subscriber's insurance plan. For instance, deficiencies with the member-services department forced Plaintiff to handle numerous phone calls. She also had respond to multiple emails throughout her day. These calls and emails were all specific to member-services issues. This work was not included in Plaintiff's original responsibilities and was unrelated to the account

manager position. This work substantially contributed to the number of hours Plaintiff worked each week.

Due to having to complete this extra work, Plaintiff was required to work overtime. The demands of Plaintiff's workload caused her to regularly work outside of her regular schedule. She consistently worked well over forty (40) hours each workweek. This was the only way she could fulfill all of the duties she had to perform.

Persistent issues with inadequately trained co-workers forced Plaintiff to work excessive hours. The sheer volume of work she had to complete caused Plaintiff to work non-stop. Plaintiff was required to work between sixty (60) and seventy (70) hours each week. There were occasions when she worked even more.

Plaintiff was not compensated for working these excessive hours. Defendant was able to justify this illegal act by paying Plaintiff a salary and classifying her as exempt. However, this classification was improper. Plaintiff's primary duties were non-managerial in nature. She also retained no discretion in the performance of any of her tasks.

Plaintiff was also not paid all wages due at the end of her employment. As part of her compensation package, Plaintiff was supposed to receive commission and bonus payments. Plaintiff was guaranteed these payments when her employment began.

The commission payments were specific to the number of plan renewals that Plaintiff was able to secure. Plaintiff was advised that these commissions would be computed on a monthly basis. However, Plaintiff was only paid for a portion of the commissions she rightfully earned. During her tenure, Defendant changed its compensation policies. With this change, commission payments were eliminated from Plaintiff's compensation plan. Consequently, Plaintiff was denied the commissions she was promised at the time of hire.

At the end of each calendar year, Plaintiff was also to receive retention bonuses. However, Plaintiff never received a single bonus payment.

Plaintiff is still owed her commissions and bonuses. She is still owed overtime compensation as well. Plaintiff was not subject to any proper exemption. Even so, Defendant failed to properly pay Plaintiff. She was not paid in accordance with the standards mandated by the FLSA, MWHL, or the MWPCL. Defendant's failure to adhere to these mandates necessitated the filing of this Complaint.

## THE PARTIES

1.      Plaintiff Carolyn Kinsey (hereinafter, "Plaintiff") is an adult resident of Perry Hall, Maryland.

2.      Defendant Evergreen Health Cooperative, Inc. (hereinafter, "Defendant"[1]) is a non-profit healthcare insurance cooperative.[2] Defendant competes with other for-profit companies that offer the same services.

3.      Defendant was founded in 2011. Defendant was formed as a result of the passage of the Affordable Care Act ("ACA"), 124 Stat. 119, Pub. L. 111-148 (2010).

4.      Defendant specializes in providing insurance plans to individual subscribers and employer groups.

5.      Peter Beilenson, M.D. is Defendant's chief executive officer ("CEO").

6.      Defendant maintains offices in Baltimore City, Maryland.

---

[1] Hereinafter, any reference to Defendant shall include its corporate officers and all those empowered to act as agents of the corporation, either explicitly or implicitly, or who are designated as agents under the doctrine of apparent agency. To the extent individual agents are responsible for any actions alleged in this Complaint, they are hereby incorporated by reference within the term "Defendant."

[2] Defendant is in the process of transitioning to a for-profit business.

7.    Due to the nature of its business, Defendant is subject to the FLSA, MWHL and the MWPCL.  Defendant's business meets the definition of a retail or service establishment.

8.    At all times relevant to this Complaint, Defendant was involved in the healthcare insurance industry.

9.    Defendant is subject to the FLSA, MWHL and the MWPCL.  Defendant's annual dollar volume of business exceeds five hundred thousand dollars ($500,000.00).

10.    At all times relevant to this Complaint, Plaintiff engaged in interstate commerce by the nature of the duties performed as part of her employment with Defendant.

11.    Plaintiff worked for Defendant, who at all times throughout Plaintiff's employment, fell within the description of the term "employer" under the FLSA, 29 U.S.C. § 203(d), MWHL, § 3-401(b) and the MWPCL, § 3-501(b).

12.    At all times relevant, Plaintiff and others similarly situated worked as non-exempt employees for Defendant.  The duties assigned to Plaintiff and all others similarly situated do not satisfy the duties tests contained within the exemptions specified in the FLSA, MWHL, or the MWPCL.

13.    From April 6, 2015 to October 26, 2016, Plaintiff was employed with Defendant. For the full duration of her employment, Plaintiff held the title of account manager.

14.    Plaintiff worked exclusively at Defendant's Baltimore office, located at 3000 Falls Road, Suite 1, Baltimore, Maryland 21211.

15.    At all times relevant to this Complaint, Defendant supervised the administration of its business and set employee schedules, including Plaintiff's and those of other similarly situated employees.

16. Defendant's agents were, individually and together, actively engaged in the management and direction of Plaintiff and other similarly situated employees.

17. Defendant possessed and exercised authority to determine the hours worked by Plaintiff and others similarly situated.

18. Defendant controlled Plaintiff's tasks and the tasks of others similarly situated.

19. Defendant had and exercised the power to change the course of Plaintiff's and other similarly situated employees' duties.

20. Plaintiff and members of the putative class recognized Defendant's authority and obeyed Defendant's instructions.

21. Defendant made all decisions relating to Plaintiff and other similarly situated employees' rates and methods of pay.

## **JURISDICTION AND VENUE**

22. Original jurisdiction in this Honorable Court is expressly provided by the FLSA, 29 U.S.C. § 207, *et seq*. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this matter presents a federal question.

23. Discretionary supplemental jurisdiction of Plaintiff's Maryland state law claims is provided by 28 U.S.C. § 1367(a); the state law claims form part of the same case or controversy and derive from a common nucleus of operative facts, on which Plaintiff's federal claims are based.

24. Furthermore, no reasons exist that would force this Honorable Court to decline jurisdiction; the state law claims (i) do not raise novel or complex issues of state law, (ii) do not substantially predominate the claims over which this Honorable Court has original jurisdiction and (iii) no exceptional circumstances exist that would constitute a compelling reason for declining jurisdiction, thereby satisfying 28 U.S.C. 1367(c).

25.     Pursuant to 28 U.S.C. § 1391(b), venue is appropriate; the unlawful acts central to this matter occurred primarily within the State of Maryland.  Additionally, Plaintiff is a resident of the State of Maryland and has been for the entirety of the relevant period.

26.     This Honorable Court has personal jurisdiction over Defendant; Defendant is a corporation incorporated under the laws of Maryland and Defendant conducts sufficient business within the forum state so as to constitute a submission to its laws.

## FACTUAL ALLEGATIONS FOR ALL CLAIMS

27.     Defendant is a healthcare insurance cooperative.  Defendant specializes in providing benefit plans to individuals and employer groups.

28.     From approximately April 6, 2015 until October 26, 2016, Plaintiff was employed with Defendant.  She was hired by Ann Marie Hoffmaster (hereinafter, "Hoffmaster"), the Vice President of Human Relations.

29.     When her employment began, Plaintiff was informed that she was to report directly to the director of the account management department.

30.     At all times relevant to this Complaint, the director of the account management department oversaw all of Plaintiff's work and distributed all of Plaintiff's assignments.[3]

31.     Plaintiff was hired to perform work as an account manager.  The focus of this position was to handle account renewals.

32.     Account renewals ("renewals") are a standard practice in the healthcare industry. Renewals stem from changes to subscribers' insurance plans.

---

[3] In August of 2016, the director of the account management department resigned.  At that time, Plaintiff began to report directly to the chief of marketing.

33.     Defendant is required to inform individuals and employer groups of modifications to their healthcare plans.  This is completed each contract/calendar year.  Updates are typically submitted in predetermined intervals.

34.     Notice of benefit changes are routinely provided each twelve (12) month contractual period.  This includes notice of rate adjustments for the next period.

35.     When her employment began, the work pertaining to account renewals took up the majority of Plaintiff's time.  The work specific to the notification process was extensive.

36.     One of Plaintiff's main responsibilities was to procure plan data.  This information was already stored in Defendant's internal system.

37.     Plaintiff had to enter this information into Defendant's software.  She would then run the program specific to the member groups that were renewing that month.

38.     The software would automatically calculate the new renewal rate for the particular group.   The rates were governed by a preset formula.  Once generated, this information was then transcribed into paper files.

39.     Plaintiff was responsible for distributing the documents to the appropriate parties, which included third-party administrators, insurance brokers, employer groups and individual policy holders.

40.     Distributing the documents served as one of Plaintiff's primary functions.  It was always an integral part of her employment.

41.     Defendant characterized this process as "releasing the renewals."  Each of the steps described above was a necessary component to the process.

42.     It was required that Plaintiff follow these steps precisely.  Defendant maintained strict protocols regarding this requirement.

43.     Plaintiff had no input regarding these protocols.  She had no involvement with the system that Defendant created.

44.     Plaintiff did not participate in the system's design.  She merely utilized the system for the purpose of completing her tasks.

45.     There were additional tasks that Plaintiff had to perform.  These tasks were also specific to the renewal process.

46.     All modifications to benefit plans had to be presented to the policy holders.  These presentations were termed "renewal meetings."

47.     Before each presentation, Plaintiff was responsible for obtaining the actual renewal plans.  She was also tasked with organizing the information to be presented.

48.     The meetings were for the purpose of allowing subscribers to request changes to their policies.  The meetings were regularly scheduled during open enrollment periods.

49.     Plaintiff was responsible for conducting these meetings.  Plaintiff would regularly meet with persons responsible for selling Defendant's insurance plans.

50.     Plaintiff's primary contacts were with insurance brokers.  These persons were typically employer liaisons.   She would also meet with third-party members and small employer groups.

51.     The meetings consisted of Plaintiff explaining the various plans.  Subscribers would then choose the plan that best suited their needs.  Plaintiff's role was to provide the relevant data so that an informed decision could be made.

52.     Any changes made to the different plan options were formulated by management officials.  Upper management made all decisions regarding these issues.

53.     The benefit plans had to conform to specific guidelines and were congruent with standards in the industry.

54.     Before being presented, the plans had to be approved by the Maryland Insurance Administration ("MIA").  There were no exceptions to this policy.

55.     For all of these reasons, Plaintiff was not involved with the development of the plans.  Only management officials were involved with their development.

56.     Plaintiff had no discretionary power.  She lacked the authority to alter the plans in any way.

57.     Plaintiff did not have the authority to negotiate or advise.  She was solely charged with presenting the plan options at the renewal meetings.

58.     Higher level management was responsible for developing both the content of the meetings and the scope of Plaintiff's discussions.

59.     As all plans were predetermined, it was mandatory that Plaintiff's discussions conform with Defendant's instructions.  Her discussions with members, insurance brokers and employer groups were always constrained within the parameters of the plans.

60.     Plaintiff was not required to relay information beyond the instructions that she was given.  Her discussions centered on the modifications to the benefit plans.

61.     The plans described by Plaintiff could not be altered.  Therefore, the renewal meetings were not a venue for negotiation.

62.     The meetings conformed to a systematic process.  As such, Plaintiff only had to provide minimal input at the meetings.  A concise briefing was all that was required.

63.     Recommending the best plan for a given broker was unnecessary.  Giving advice was also not required.   Plaintiff was not utilized in this capacity.

64. Plaintiff simply provided notifications without embellishment. She acted solely as a liaison.

65. There were additional responsibilities included with Plaintiff's renewal tasks. For instance, if a member group requested benefit changes, Plaintiff was responsible for entering the requests. The information had to be logged into Defendant's software.

66. Plaintiff had to make sure that member files were properly updated. This was to ensure that subscribers received the correct plans.

67. Updating the files consisted of simple data entry. Defendant's software was the only tool needed to update a member's file. The software would implement the updated information automatically.

68. As an account manager, Plaintiff was also required to respond to general inquiries from employer groups. The inquiries primarily pertained to coverage issues.

69. Responding to these inquiries did not require the use of discretion. This was because all healthcare plans were predetermined.

70. Plaintiff retained no discretion in the performance of any of her tasks.

71. Plaintiff was always required to gain clearance from upper management officials for any complex decisions.

72. The director of the account management department was the primary person that gave Plaintiff her assignments.

73. The director of the account management department was the primary person that monitored Plaintiff's work.

74. Plaintiff and others similarly situated had to follow all of the directions given to them.

75. Plaintiff and others similarly situated had no say in any of the instructions that they were given.

76. Plaintiff and other similarly situated employees could not, and did not, hire or fire employees.

77. Plaintiff and other similarly situated employees made no recommendations in regard to hiring or firing.

78. Plaintiff and other similarly situated employees did not supervise the work completed by Defendant's other employees.

79. If an employee had a work-related concern, he or she would report that concern to an upper management official, not Plaintiff.

80. While performing their daily tasks, Plaintiff and other similarly situated employees did not require any specialized training or advanced knowledge.

81. Plaintiff and others similarly situated did not perform any analysis.

82. Plaintiff and others did not interpret any information.

83. Plaintiff and other similarly situated employees' tasks did not require the use of independent judgment.

84. Plaintiff satisfied the requirements of her job and adequately performed her duties to benefit Defendant, as well as Defendant's subscribers.

85. Plaintiff performed all of her assigned tasks to the extent required by Defendant.

86. For the aforementioned work, from approximately April 6, 2015 until March of 2016, Plaintiff received bi-weekly payments of two thousand two hundred and sixty-nine dollars and twenty-three cents ($2,269.23). This equates to an annual salary of approximately fifty-nine thousand dollars ($59,000.00).

87. In March of 2016, Plaintiff received a three percent (3%) wage increase.

88. From approximately March of 2016 to October 26, 2016, Plaintiff received bi-weekly payments of two thousand three hundred and thirty-seven dollars and thirty-one cents ($2,337.31). This equates to an annual salary of approximately sixty thousand seven hundred and seventy dollars ($60,770.00).

89. For the entirety of her tenure, Plaintiff worked as a salaried employee for Defendant. She received the same bi-weekly payments regardless of the number of hours she worked each week.

90. At the time of hire, Defendant advised Plaintiff that she would only be working forty (40) hours each week. Plaintiff was told that her schedule would be from 8:30 a.m. to 5:00 p.m., five (5) days a week. This was to include a thirty (30) minute lunch break.

91. For the duration of her employment, Plaintiff always worked hours outside of her regular schedule. This resulted from the volume of assignments she had to complete.

92. The duties specific to account renewals were time-consuming.

93. Preparing for the renewal meetings and the data entry associated with updating a subscriber's file routinely required Plaintiff to work overtime.

94. Plaintiff regularly worked straight through her scheduled shifts.

95. Plaintiff's workload often prevented her from taking a lunch break. Eating at her desk while continuing to work was a consistent practice.

96. In order to complete all of her duties, Plaintiff regularly arrived at work prior to when her shifts were scheduled to begin. Plaintiff also regularly left work after her shifts were scheduled to end. This practice caused Plaintiff to work overtime consistently.

97.     Subsequent changes to Defendant's business resulted in Plaintiff working additional overtime.  The changes had the effect of shifting the character and scope of Plaintiff's responsibilities.

98.     In December of 2015, Defendant brought in a new member-services vendor, Valence TPA (hereinafter, "Valence").  This resulted in structural changes to Defendant's business.

99.     These changes altered the manner in which new claims were processed and Defendant's enrollment procedures.

100.    As an account manager, Plaintiff's job duties did not include the processing of new claims.  They also did not involve tasks concerning a subscriber's initial enrollment.

101.    These assignments related to other departments.  Staff from Valence's claims and enrollment departments were supposed to handle this work.

102.    Unfortunately, many of Valence's employees were not sufficiently equipped or trained to perform their duties. They lacked the necessary experience and familiarity with Defendant's products.  There were particular problems with employees from Valence's member-services department.

103.    For instance, it was common for Valence's member-services personnel to be unfamiliar with Defendant's benefit plans and policies.  This hindered their ability to appropriately respond to basic inquiries posed by subscribers.

104.    Valence's employees also failed to receive proper guidance and training.  This was specific to the new procedures that developed from Defendant's change in vendors.  These procedures related to the mechanical aspects of the business.

105.    The change in vendors resulted in the implementation of a new electronic system. Valence's member-services employees were unfamiliar with how to operate the new system and failed to receive proper training regarding its use.

106.    Member-services personnel were unable to maneuver through the system in an efficient manner.  This led to difficulties regarding the performance of their tasks.

107.    Their unfamiliarity and lack of knowledge was not remedied.  This required Plaintiff to perform additional work.  Plaintiff was forced to use her own time to make up for the shortcomings of member services personnel.

108.    For instance, mistakes made by Valence's member-services department forced Plaintiff to have to address concerns from medical providers. Plaintiff was required to make numerous phone calls throughout her day.  Plaintiff had to ensure that providers had the correct information in regard to how to submit their claim forms.

109.    Moreover, due to their unfamiliarity with the system, member-services employees were often unable to retrieve information requested by group members.  It was not uncommon for member-services employees to give subscribers incorrect answers to questions.

110.    This raised concerns and resulted in subscribers notifying their employers of these concerns.  This in turn would lead employers to advise their insurance brokers of the issue.  Brokers would then contact the account management department for clarification.

111.    Due to the communication breakdown created by member-services personnel's lack of knowledge, it was routine for these problems to fall into Plaintiff's lap.  This resulted in Plaintiff having to handle a large number of inquiries from brokers.

112.     The lack of training amongst the member-services personnel was the direct cause of these inquiries.  These inquiries greatly expanded Plaintiff's workload.  Plaintiff was flooded with phone calls and emails continuously throughout her day.

113.     The nature of her role forced Plaintiff to respond to these inquiries.  This was despite the fact that doing so would hinder the completion of her primary tasks.

114.     Having to respond to the constant inquiries from brokers forced Plaintiff to work non-stop.  It was common for Plaintiff to respond to inquiries prior to when her shifts were to begin.

115.     Responding to these inquiries after business hours was also a regular practice.  It became routine for Plaintiff to answer inquiries late in the evening.

116.     Responding to these inquiries caused Plaintiff to fall behind on her regular assignments.  There was not enough time in the day for Plaintiff to complete the tasks associated with the account manager position on top of those related to member-services.

117.     Valence's failure to adequately train its member-services staff had the effect of dramatically increasing Plaintiff's workload.  The combination of all of her duties forced Plaintiff to consistently work overtime.

118.     There were other issues that caused Plaintiff to work overtime as well.  These issues related to Defendant's internal network.

119.     Defendant's enrollment system ("system") was modified at the time it changed vendors.  The modifications were aligned with the amendments made to Defendant's benefit plans.

120.     Close in time to when the modifications were implemented, mechanical problems with the enrollment system began to develop.  The problems were the direct result of the changes made to the system.

121.     This made it difficult for member-services employees to utilize the system appropriately.  Technical glitches within the system occurred frequently.

122.     The new system was also not user friendly.  Persistent issues with the enrollment system prevented the easy dissemination of information between member-services personnel and subscribers.

123.     These issues again resulted in Plaintiff having to perform additional work, work that should have been performed by member-services personnel.  However, their inability to operate Defendant's enrollment system, combined with the severe technical problems, resulted in many of their tasks being forwarded to Plaintiff.

124.     For instance, Plaintiff had to make regular calls to medical providers regarding their difficulty in verifying information that member-services personnel would ordinarily be able to confirm.  The information was often as basic as the address needed to submit a claim.  It was common for Plaintiff to have to retrieve the information herself.

125.     Insurance brokers would also call on behalf of member groups seeking basic information.  Member-services would often have difficulty retrieving information as simple as the subscriber or subscriber group's identification number.

126.     It was common for Defendant's participating providers to report that the number they were given by member-services was invalid.  This was caused by a system update that had the practical effect of updating the identification numbers.  This resulted from Defendant' change in vendors.

127.     The new vendor system had the effect of generating identification numbers with an additional digit.  The number "zero" began to be automatically applied to a member's number.

128. There was a significant delay in providing members with identification cards reflecting their new identification number. This also resulted in an increase in calls from members who were unable to access their benefits.

129. Issues such as these prevented members from obtaining their correct identification numbers. These issues were common throughout Plaintiff's employment. The issues caused substantial confusion amongst Defendant's members and staff.

130. Similar mistakes resulted in more discord. One such mistake was specific to a member's attempts to fill their medications.

131. Due to technical problems with the enrollment system, combined with their failure to receive new identification cards in a timely manner, members often gave pharmacists identification numbers that were incorrect. This prevented pharmacists from being able to fill a member's prescription.

132. The pharmacists would then call member-services for purposes of retrieving the correct identification number. However, because of their lack of training, member-services personnel were often incapable of providing the information.

133. Brokers would regularly call on behalf of members to inform an account manager of these concerns. This would result in Plaintiff having to contact the pharmacists directly in order to provide the information needed.

134. Defendant's member-services employees were often incapable of handling these and similar systemic issues. This was despite the fact these issues clearly fell within the scope of their duties. Consequently, following the time in which Defendant changed vendors, these types of issues were forwarded to Plaintiff.

135.     Plaintiff was the sole account manager at the time Defendant changed vendors.[4] Understaffing resulted in Plaintiff having to perform the majority of the tasks charged to member-services personnel.

136.     Defendant was slow to adapt to the changes that the restructuring of its business engendered.   The changes it did eventually make did little to assist Plaintiff with her workload.

137.     For instance, in August of 2016, Defendant transferred one of its employees to the account management department.   However, said employee had no formal training or experience with the account management aspect of the healthcare industry.

138.     The employee knew nothing about benefit plans.   She also seemed uninterested in learning.   Therefore, she was unable to provide any support to Plaintiff.[5]

139.     Defendant subsequently staffed another employee in the account management department.   However, this employee was also of limited use.

140.     The employee was only required to assist on a part-time basis.[6]

141.     The employee was also instructed to perform work solely related to account renewals.   She never assisted Plaintiff with any of the clerical tasks pertaining to member-services. Therefore, she failed to alleviate the understaffing issues that caused Plaintiff's workload to increase.

---

[4] While the director of the account management department performed a similar role, she was unable to prevent or alleviate the changes that profoundly altered Plaintiff's workload.

[5] The employee referenced did not report to Plaintiff in any capacity.   Defendant made this clear.   The employee held the same title as Plaintiff.   Her salary was also the same.

[6] For the duration of Plaintiff's employment, the employee referenced was only staffed in the account management department part-time.   She continued to complete her regular duties, which were specific to one of Defendant's other departments.   The employee was not staffed in the account management department permanently until after Plaintiff's employment ended.

142.     Because Defendant failed to hire and adequately train enough employees to assist with the clerical aspects of its business, Plaintiff was forced to complete the numerous clerical tasks described above.

143.     These clerical tasks caused Plaintiff to routinely work over forty (40) hours each week.

144.     Once Plaintiff took on the tasks that should have been performed by member-services personnel, she had no choice but to work substantial overtime.

145.     Plaintiff regularly arrived to work between 8:00 a.m. and 8:15 a.m., a time prior to when her shifts were to begin.

146.     Upon arrival, Plaintiff consistently worked straight through her shifts.  She rarely took a break.

147.     Due to her multitude of tasks, Plaintiff also regularly performed work from home. It was common for Plaintiff to start working from home shortly after she left work.

148.     Plaintiff consistently worked two (2) to four (4) hours from home each night.  There were times when she worked even longer.  Plaintiff can recall instances when she worked as late as midnight.

149.     There was always a substantial amount of work to be done.  Completing the multitude of duties specific to account management and member-services was a very arduous task.

150.     Plaintiff received telephone calls and emails from insurance brokers and employer groups at all times throughout the day.  This included periods when she was not physically present at work.

151.     It was common for Plaintiff to receive inquiries after business hours.  The inquiries often pertained to questions regarding the renewal process.

152.    It was also routine for Plaintiff to receive inquiries at night related to service problems.  These problems resulted from Defendant's change in vendors.  The majority of the inquiries that occurred after hours were in reference to these problems.

153.    Plaintiff's demanding workload forced her to work on the weekends.  She consistently worked anywhere between two (2) and six (6) hours on Saturday or Sunday.  Plaintiff's heavy workload sometimes caused her to work both days.

154.    The complications that resulted from Defendant's change in vendors caused Plaintiff to consistently work anywhere from sixty (60) to seventy (70) hours each week.

155.    Due to the volume of her assignments, working overtime was a regular part of Plaintiff's employment.

156.    Defendant was well aware that Plaintiff consistently worked more than forty (40) hours each week.

157.    Defendant suffered or permitted Plaintiff to work these overtime hours.

158.    Defendant was well aware of the demands of Plaintiff's position.

159.    Defendant knew that these demands required that Plaintiff frequently perform work after regular business hours and on weekends.

160.    Defendant knew that Plaintiff regularly received work-related calls and emails before and after her scheduled shifts.

161.    Defendant knew that it failed to hire a sufficient number of employees to assist Plaintiff with her workload.

162.    Defendant was also aware that those it did subsequently employ were insufficiently trained to be of any real use.

163.    Defendant knew that these conditions caused Plaintiff to work excessive hours.

164.    Defendant failed altogether to compensate Plaintiff for working these additional hours.

165.    Regardless of how many hours Plaintiff worked, she was only paid her regular salary.

166.    Defendant paid Plaintiff a salary to circumvent both Federal and Maryland wage laws.

167.    The duties performed by Plaintiff did not implicate any exemptions contained within the FLSA, MWHL, or the MWPCL.

168.    There is no bona fide dispute that Plaintiff is owed overtime wages for hours worked over forty (40) in a workweek.

169.    Defendant failed altogether to pay Plaintiff these wages.

170.    It is clear that Defendant's conduct was willful.

171.    For months, Plaintiff made a series of complaints regarding her requests for additional compensation.  This was to account for the overtime hours she worked.

172.    Defendant ignored these requests and continued to pay Plaintiff incorrectly.

173.    Defendant also failed to pay Plaintiff correctly in other ways.

174.    In addition to her regular salary, Plaintiff was also supposed to receive commission payments.

175.    The commissions were to be calculated based on the number of subscribers that renewed each month.  Plaintiff was to receive three dollars ($3.00) for each subscriber that renewed.

176. Plaintiff was also promised retention bonuses. Plaintiff was to receive these bonuses at the end of each calendar year.[7]

177. Plaintiff never received the commission and bonus payments that she was promised.

178. Plaintiff was never compensated with commission or bonus payments in a manner consistent with what Defendant guaranteed. These guarantees were made at the time Plaintiff's employment began.

179. There were frequent irregularities with the commission structure. Although she began work in April 2015, Plaintiff did not receive her first commission check until July of that year, despite Plaintiff having contributed to the renewal of several policies during the preceding months. Had Defendant paid Plaintiff the commissions in accordance with its own policies, Plaintiff would have received a commission check well before July of 2015.

180. In December of 2015, Defendant also changed the manner in which commissions were calculated. Consequently, monthly renewal commissions stopped at that time. Plaintiff's base salary was never increased to make up for the lost commission payments.

181. Plaintiff also never once received a bonus payment.[8]

182. Consequently, Plaintiff, on behalf of herself and all those similarly situated, seeks all wages to which she is entitled and other available relief through this complaint.

## FLSA COLLECTIVE ACTION ALLEGATIONS

---

[7] End of year retention bonuses are typical in Plaintiff's industry. There were two (2) separate bonuses Plaintiff was to receive: Annual Group Consistency Bonus and an Annual Small Group Subscriber Consistency Bonus. The bonuses were included with a well-documented written policy.

[8] Plaintiff's 2015 bonus check should have totaled approximately five thousand five hundred dollars ($5,500.00). Her retention rate for that year was over ninety percent (90%).

183.    Plaintiff and other similarly situated employees work or worked as account managers for Defendant.

184.    The FLSA requires employers to compensate non-exempt employees such as Plaintiff and others similarly situated overtime wages for all hours worked over forty (40) within a workweek.

185.    Defendant knew that Plaintiff and similarly situated employees typically worked over forty (40) hours per week.

186.    Defendant suffered or permitted Plaintiff and other similarly situated account managers to work more than forty (40) hours per week.

187.    Defendant knew or should have known that Plaintiff and those similarly situated were entitled to overtime pay for all hours worked over forty (40) in a workweek.

188.    Pursuant to the FLSA, Plaintiff commences this collective action against Defendant on behalf of herself and those similarly situated.

189.    Plaintiff demands damages reflecting an overtime rate of not less than one and a half (1.5) times her regular rate of pay for all hours worked over forty (40) in any workweek within the applicable statute of limitations.  Plaintiff makes these same demands on behalf of all members of the putative collective.

190.    Plaintiff consents to be party plaintiff in this matter.  Plaintiff's consent form is attached to this Complaint as Exhibit A.

191.    It is likely that other individuals will join Plaintiff during the litigation of this matter and file written consents to "opt in" to this collective action.

192.    There are similarly situated current and former employees of Defendant that have been harmed by Defendant's common scheme to underpay its employees and violate the FLSA.

193.    These similarly situated persons are known to Defendant and are readily identifiable through Defendant's records.

194.    Many of these similarly situated employees would benefit from the issuance of court-supervised notice, granting them the opportunity to join this lawsuit.

195.    Upon information and belief, others will choose to join Plaintiff in this action against Defendant and opt in to this lawsuit to recover unpaid wages and other available relief

## CAUSES OF ACTION AND VIOLATIONS OF LAW

### *Count I - Violation of the FLSA: Failure to Pay Overtime Wages to Plaintiff and all Members of the Collective Class Who, During The Course of This Matter, Opt-In to the Suit by Submitting their Consent Forms to Become a Party Plaintiff*

196.    Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

197.    Plaintiff is entitled to overtime under 29 U.S.C. § 207(a), which provides that employers must compensate their employees for hours worked in excess of forty (40) in a workweek at a rate of not less than one and one-half (1.5) times the regular rate at which they are employed.

198.    As described above, Plaintiff has not received from Defendant compensation reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a week; Defendant failed to compensate Plaintiff for these additional hours.

199.    Defendant willfully and intentionally failed to compensate Plaintiff for the overtime wages she is owed.  There is no bona fide dispute that Plaintiff is owed overtime wages for work performed for Defendant.

200. Under the FLSA, Plaintiff is entitled to additional wages from Defendant to compensate her for hours worked in a workweek in excess of forty (40) at a rate of one and one-half (1.5) times Plaintiff's regular hourly wage rate.

***Count II. Violation of MWHL: Failure to Pay Overtime Wages to Plaintiff, all those that are Joined as Party Plaintiffs in this Matter by Motion or by Any Other Means Deemed Appropriate by This Honorable Court***

201. Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

202. Pursuant to Maryland Labor and Employment Code Ann. § 3-415, each employer shall pay an overtime wage of at least one and one half (1.5) times the regular hourly rate; furthermore, pursuant to Maryland Labor and Employment Code Ann. § 3-420(a), an employer shall compute the wage for overtime under § 3-415 on the basis of each hour over forty (40) that an employee works during one (1) workweek.

203. Plaintiff has not received compensation from Defendant reflecting the prescribed overtime wage rate for hours worked in excess of forty (40) in a week.

204. Defendant willfully and intentionally did not compensate Plaintiff for the overtime wages she is owed. There is no bona fide dispute that Plaintiff is owed overtime wages for work performed for Defendant.

205. Under MWHL, Plaintiff is entitled to additional wages from Defendant for all overtime hours worked at a rate of one and one-half (1.5) times Plaintiff's regular hourly wage rate.

***Count III - Violation of the MWPCL: Failure to Pay Wages Owed at the Termination of Its Employment to Plaintiff, all those that are Joined as Party Plaintiffs in this Matter by Motion or by Any Other Means Deemed Appropriate by This Honorable Court***

206.     Plaintiff hereby fully incorporates in this Count all allegations contained within Plaintiff's Complaint.

207.     Plaintiff is entitled to wages under the Maryland Wage Payment and Collection Law, Md. Code Ann., Lab. & Empl. §§3-501, *et. seq*., which provides that each employer shall pay an employee all wages due for work that the employee performed before the end of employment, on or before the day on which the employee would have otherwise been paid the wages.  Under the MWPCL, "wages" include the commission and bonus payments that Plaintiff is owed. Md. Code Ann., Lab. & Empl. §§ 3-501(c)(1-2).

208.     In accordance with MWPCL §3-505(a), Plaintiff has not received compensation from Defendant for all wages owed for work performed before the termination of her employment. This is specific to Defendant's failure to pay Plaintiff the overtime wages to which she is entitled as well as the commission and bonus payments that Plaintiff is owed.

209.     Defendant willfully and intentionally did not compensate Plaintiff for all the wages owed to her and continued to violate the MWPCL, even after Plaintiff informed Defendant of the violation.

210.     Under the MWPCL, there is no bona fide dispute that Plaintiff is owed wages, commissions and bonuses for work performed while employed by Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of herself and others similarly situated, prays for the following relief:

a)     In accordance with 29 U.S.C. § 216(b), designation of this action as a collective action on behalf of Plaintiff and those similarly situated;

b)     Ordering Defendant to disclose in computer format, or in print if no computer readable format is available, the names, addresses and emails of all those individuals

who are similarly situated and permitting Plaintiff to send notice of this action to all those similarly situated individuals;

c) Designating the named Plaintiff to act as a class representative on behalf of all similarly situated employees for the FLSA collective class;

d) Judgment against Defendant for its failure to pay Plaintiff, members of the putative collective class and those appropriately joined to this matter in accordance with the standards set forth by the FLSA;

e) Judgment against Defendant for its failure to pay Plaintiff and those appropriately joined to this matter in accordance with the standards set forth by MWHL;

f) Judgment against Defendant for its failure to pay Plaintiff and those appropriately joined to this matter in accordance with the standards set forth by the MWPCL;

g) Judgment against Defendant and classifying its conduct as willful and not in good faith;

h) Judgment against Defendant and classifying Plaintiff, the collective class and those appropriately joined in this matter as non-exempt employees entitled to protection under the FLSA, MWHL and the MWPCL;

i) An award against Defendant for the amount of unpaid overtime wages owed to Plaintiff and those similarly situated, calculated at a rate that is not less than one and a half (1.5) times Plaintiff's and other similarly situated employees' regular hourly rate for all overtime hours worked;

j) An award of liquidated or trebled damages equal to, or double, the total amounts of unpaid wages owed to Plaintiff, those similarly situated and those properly joined in this matter, whichever is deemed just and equitable by this Honorable Court;

k) Injunctive relief in the form of an order prohibiting Defendant from violating the FLSA, MWHL and the MWPCL in the future;

l) An award of reasonable attorneys' fees and all costs, plus pre-judgment and post-judgment interest, to be satisfied in full by Defendant;

m) Leave to add additional parties to all claims by motion, through the filing of written consent forms, or any other method approved by this Honorable Court; and

n) All further relief deemed just and equitable by this Honorable Court.

## REQUEST FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests that a jury of her peers hear and decide all possible claims brought on behalf of Plaintiff and those similarly situated.

Respectfully submitted,

*/s/ Benjamin L. Davis, III*
Benjamin L. Davis, III, Esq. (29774)
bdavis@nicholllaw.com
George E. Swegman, Esq. (19444)
gswegman@nicholllaw.com
The Law Offices of Peter T. Nicholl
36 South Charles Street, Suite 1700
Baltimore, Maryland 21201
Phone No.: (410) 244-7005
Fax No.:    (410) 244-8454

*Attorneys for Plaintiff*